**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ARTIS C. CARROLL, JR.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 22-1720** |
| | : | |
| **DELAWARE COUNTY OF** | : | |
| **PENNSYLVANIA,** *et al.* | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                       **April 10, 2023**

A pre-trial detainee pro se sues Delaware County, the Delaware County Jail Oversight Board, its private prison administrator The Geo Group, and identified state actors claiming they maintained unconstitutional conditions of confinement, precluded access to the courts, and retaliated against him while holding him in custody at the George W. Hill Correctional Facility for a few weeks in November 2021 and since February 2022. We dismissed his Complaint upon screening in December 2022 with leave to amend. We now screen his amended Complaint. The pre-trial detainee barely alleges sufficient facts to plausibly allege two deficient conditions of confinement claims based on exposure to extreme temperatures and overcrowding while in the Intake Unit against some of the identified state actors but not all. The pre-trial detainee still does not plead facts allowing him to proceed on his access to the courts, First Amendment retaliation, or denial of information about class settlement requiring we dismiss these claims with prejudice. He also does not plead a conditions of confinement claim other than for damages based solely on the extreme cold and overcrowded conditions of the Intake Unit in November 2022 and February 2022 during the pre-trial detainee's limited time in the Intake Unit.

I.     **Alleged *pro se* facts.**

Serial litigant Artis C. Carroll challenges conditions of confinement and restrictions placed on him during his most recent incarceration at the George W. Hill Correctional Facility in Delaware County. The Commonwealth detained Mr. Carroll awaiting his trial at the George W. Hill Correctional Facility. It first held Mr. Carroll in the Intake Unit from November 4, 2021 to November 13, 2021 and moved him to the Classification Unit from November 13, 2021 to November 20, 2021. The Commonwealth then released him subject to further hearings. He allegedly failed to comply with his release terms. The Commonwealth then arrested him again and placed him in the same Intake Unit from February 1, 2022 to February 6, 2022 and moved him to the Facility's Classification Unit from February 6, 2022 to February 27, 2022. The Commonwealth then moved Mr. Carroll to the Facility's general population beginning on February 28, 2022 where he remains incarcerated when filing his amended Complaint.[1]

### *Police arrest Mr. Carroll in November 2021.*

The Upper Darby Police Department arrested Mr. Carroll on November 4, 2021.[2] Another officer transported Mr. Carroll to the police department where an officer filed a criminal complaint against Mr. Carroll.[3] Mr. Carroll attended a preliminary arraignment by video conference at the police station where a magistrate judge set bail at $25,000.[4] Mr. Carroll could not afford bail. The Commonwealth transported him to the George W. Hill Correctional Facility.[5]

### *Mr. Carroll remains in the Intake Unit from November 4 to November 7.*

Mr. Carroll arrived at the Facility's Intake Unit on November 4, 2021 as a pre-trial detainee.[6] Officers transferred Mr. Carroll to the care and custody of Lee Tatum, the warden of the Facility and the "chief decision maker" of the Intake Unit's conditions, customs, policies, and practices.[7]

Correctional Officer A. Banks placed Mr. Carroll in Intake Unit Cell 3B126 on November 4, 2021 with about seventeen to twenty-five other men.[8] The cell measured about twelve feet in length and seven feet in width with no windows.[9] The "extreme overcrowding" prevented Mr. Carroll from taking more than one step in any direction without asking other pre-detainees to "make room" resulting in "severe irritation, emotional distress, anxiety, mental anguish, and feet, neck and back pain."[10] Mr. Carroll and other pre-trial detainees would carefully jog in place to encourage normal blood flow, but parts of Mr. Carroll's leg would go numb every day due to prolonged sitting on the cramped concrete floor.[11]

The cell contained an inoperable water fountain and toilet.[12] Correctional Officers F. Weaver and Banks, along with unnamed correctional officers, expected the pre-trial detainees to use the inoperable and unsanitary toilet.[13] The lights in the cell remained on for twenty-four hours and the windows reflected sound back which resulted in prolonged excessive loud noises.[14] The Facility gave Mr. Carroll and the other pre-trial detainees two thin white sheets and one small blanket for sleeping on the concrete floor despite the cell reaching temperatures of forty to fifty degrees during the night.[15] Correctional Officer Weaver did not give Mr. Carroll socks and undergarments, so Mr. Carroll had to wear the wet socks he arrived in which made his "feet freezing cold."[16] Mr. Carroll slept in a "tight fetal position" on the cold, concrete floor without a mattress because of the "extreme overcrowding" in the cell which caused him severe neck and back pain.[17] The excessive noise in and around the cell caused Mr. Carroll headaches and further prevented him from sleeping.[18]

The Facility kept Mr. Carroll in the Intake Unit cell for twenty-four hours a day from November 4, 2021 until November 7, 2021.[19] The Facility's classification coordinator Michael Moore, the Facility's intake supervisor Lieutenant Moore, and Correctional Officers Weaver and

Banks, along with unnamed officers, did not try to move Mr. Carroll and others into more humane conditions despite knowing of alternative housing.[20] He contends the Facility's administrator David Byrne, Warden Lee Tatum, Deputy Warden Mario Coloucci, and Lieutenant Moore knew from "personal observation, prison records, prior complaints, lawsuits, and settlement agreements" about the "inhumane conditions" in the Intake Unit, but failed to remedy the problem "with deliberate indifference and punitive intent."[21] And Mr. Carroll alleges the Geo Group, which operates and manages the Facility, Delaware County, and the Delaware County Jail Oversight Board have a policy to place inmates into severely overcrowded cells for more than a few days without bedding, water, bathrooms, and "warmth[.]"[22]

### The Facility moves Mr. Carroll to a different Intake Unit cell.

The Facility moved Mr. Carroll to Intake Unit Cell 3B111 on November 7, 2021 until November 13, 2021 with about twenty to twenty-five other men.[23] Intake Unit Cell 3B111 is similar to Intake Unit Cell 3B126, but is slightly larger measuring approximately fifteen feet long and seven feet wide.[24] Mr. Carroll claims he experienced the same conditions in Intake Unit Cell 3B111 as Intake Unit Cell 3B126.[25] He slept one to two hours a night from November 4, 2021 until November 13, 2021.[26] Correctional officers, including Correctional Officers Weaver and Banks, "frequently denied [him] water and use of [the] bathroom."[27]

### The Facility moves Mr. Carroll to the Classification Unit.

An unnamed correctional officer moved Mr. Carroll from the Intake Unit to a cell in the Classification Unit on November 13, 2021 where he stayed until November 20, 2021.[28] Mr. Carroll shared his cell with one other man.[29] An unnamed correctional officer told Mr. Carroll and his cellmate they were temporarily being placed in the Classification Unit until they were "classified"

and given permanent housing.[30] Mr. Carroll and his cellmate remained in the cell twenty-four hours a day for those seven days.[31]

Mr. Carroll contends the average temperature in the cell fell between thirty to forty-five degrees at night and frost covered the window.[32] Mr. Carroll slept on average one to three hours each night given the extremely cold conditions.[33] Correctional officers gave him insufficient blankets to keep him warm in the cold cell.[34] The Facility released Mr. Carroll from custody in December 2021 after he made bail.[35]

### The Commonwealth detains Mr. Carroll in the Intake Unit again in February 2022.

The state court revoked Mr. Carroll's bail and the Commonwealth again arrested him and returned him to the Facility on February 1, 2022.[36] The Facility detained Mr. Carroll from February 1, 2022 to February 6, 2022 in the Intake Unit.[37] Mr. Carroll experienced the same conditions in the Intake Unit in February 2022 as those he experienced from November 4 through 13, 2021 including his cell reaching extremely cold temperatures dropping to thirty degrees to fifty degrees at night.[38]

Correctional Officers Banks and Weaver again failed to issue Mr. Carroll adequate clothing upon his arrival on February 1, 2022 including socks, undergarments, sweatshirts, thermals, or shower shoes.[39] Mr. Carroll claims Correctional Officers Banks and Weaver's failure to issue appropriate clothing resulted from "a custom, policy and/or practice created or maintained" by the Geo Group, the Delaware County Jail Oversight Board, Jail Oversight Chairmen Kevin Madden, Facility Administrator David Byrne, the Facility's Deputy Warden Coloucci, and Lieutenant Moore "including as a result of them failing to properly train and supervise" Correctional Officers Weaver and Banks.[40]

### *Mr. Carroll returns to the Classification Unit.*

The Facility transferred Mr. Carroll to the Classification Unit on February 6, 2022 until February 27, 2022.[41] Correctional officers again confined Mr. Carroll to his cell for twenty-four hours a day, seven days a week until classified.[42] Mr. Carroll claims the denial of time out of his cell caused him to become depressed, suffer severe stress and anxiety, and had an overall detrimental effect on his physical and mental health.[43] And he contends the twenty-four hours "continuous block/unit lockdowns were not due to any exigent circumstances or legitimate penological reason(s) based on [his] information and belief . . . [but] was intentionally done as part of a punitive custom, policy, and[/]or practice."[44]

### *Mr. Carroll is denied access to the law library in the Classification Unit.*

Mr. Carroll claims the Facility denied him access to the law library from November 4, 2021 to December 1, 2021 and from February 1, 2022 to February 27, 2022 while in the Classification Unit.[45] He claims he requested access to the law library, but law librarian Dana Keith ultimately declined to put him on the "Law Library List."[46] Librarian Keith also refused to provide Mr. Carroll with information about a class action settlement regarding the conditions of the Facility.[47] Mr. Carroll claims not being able to use the law library had "an overall chilling effect on [his] efforts to challenges [his] conditions of confinement and incarceration[.]"[48] He claims it caused him to miss important court deadlines and prevented him from pursuing nonfrivolous legal claims and he "lost cases [he] should have won because of the said violation."[49]

Mr. Carroll alleges Librarian Keith, Mr. Carroll's unit counselor Aiyanah Collins, and Classification Coordinator Moore enforced a policy which denied inmates in the Classification Unit access to the law library despite knowing inmates have the constitutional right to visit the law library.[50] And he contends the Geo Group, Delaware County, Delaware County Prison Oversight

6

Board, Oversight Chairman Madden, Facility Administrator Byrne, Warden Tatum, the Facility's compliance coordinator Sarah Bowels, and the law library supervisor Kelly Shaw "created" and/or "endorsed a custom, policy or practice, including the failure to properly train and supervisor" which "disenfranchises the Classification Unit from the prison Law Library rotations[.]"[51]

### *The Facility transfers Mr. Carroll to the general population.*

The Facility transferred Mr. Carroll to the general population's Unit 8C Cell 206 on February 28, 2022.[52] The Facility gave Mr. Carroll a "normal size two man bunkbed cell[.]"[53] Mr. Carroll describes his cell as "extremely dirty" upon his arrival littered with dirty towels, papers, plastic, and other forms of trash.[54] The Facility provided Mr. Carroll with an outdated, thin plastic bed mattress with a section missing causing him neck and back pain.[55] Mr. Carroll claims Correctional Officers D. Scott and F. Gilbert knew of his defective bed, but did not remedy it for about one month after Mr. Carroll's cellmate left.[56]

The toilet in Mr. Carroll's cell did not flush properly upon arrival and the water fountain in the cell ran water at a very low pressure making it unusable.[57] So Mr. Carroll's and his cellmate's waste would "constantly accumulate" in the broken toilet and would overflow.[58] Mr. Carroll and his cellmate "[s]ometimes" had to use other inmates' cell bathrooms which Mr. Carroll describes as "a hassle, embarrassing, and very stressful for everyone."[59] He made Correctional Officers Scott and Gilbert, along with other unnamed correctional officers, aware of these "inhumane and unsanitary conditions to no avail."[60] They promised to remedy the problems, but made no attempts until about a month later on March 28, 2022 when maintenance fixed the toilet and water fountain.[61] Correctional Officers Gilbert, Scott, Adaghe, Hilton, Gallangher, and other unnamed officers, also denied Mr. Carroll access to cleaning supplies.[62]

7

Mr. Carroll claims while in Unit 8C, Correctional Officers Scott, Gilbert, Adaghe, Hilton, and Gallangher, along with unnamed officers kept Mr. Carroll confined to his cell for most of the day.[63] They only allowed Mr. Carroll out of his cell for about two hours per week to eat, use the bathroom, shower, visit his counsel, and call family or friends.[64] Some weeks the correctional officers only gave Mr. Carroll thirty minutes of time outside his cell.[65] He contends the Facility has a gym and weightroom, but the correctional officers never let Mr. Carroll use the gym.[66]

Mr. Carroll contends Sergeant McCaffrey and Sergeant Serody, who are Unit 8C supervisors, Compliance Coordinator Bowels, Jail Oversight Chairman Kevin Madden, along with two other Facility employees – John Swider and Richard Leach – all of whom "have chief decision making powers regarding the training of Unit 8C [correctional officers] were ignoring inmate complaints" including Mr. Carroll's about needing proper bedding, working toilets, access to drinking water, and more time out of the cell for exercise.[67] He claims their actions in denying such requests were "part of a custom, policy, or practice create and maintained by one and or the other, including as a result of failing to train and supervise."[68]

### The Facility did not provide an indigent legal kit.

Mr. Carroll claims while incarcerated the Facility never provided him with free legal kits or free writing kits.[69] He contends the Facility instead has a policy which requires incarcerated individuals to meet with their prison counselors for free legal and writing kits.[70] But Mr. Carroll's counselors, including Classification Coordinator Moore and Counselor Collins, failed to provide him with a kit on November 13, 2021 through December 1, 2021, and then again from February 6, 2022 until February 27, 2022.[71] Counselors Collins and Shawnell George (who replaced Counselor Collins) only met with Mr. Carroll once or twice a month from April 4, 2022 to

December 18, 2022—and some months not at all—despite Mr. Carroll's requests to meet with them.[72]

Mr. Carroll claims Counselors Collins and George and Classification Coordinator Moore failed to give him at least two stamped envelopes per week.[73] They instead provided Mr. Carroll with two plain envelopes which he could only send to a court address or the Public Defender Office.[74] Mr. Carroll contends along with the two plain unstamped envelopes, Counselors Collins and George gave him two small pre-sharpened pencils and one or two erasers, but no pencil sharpener, pens, or writing paper.[75] Mr. Carroll claims without a pencil sharpener he had been forced to sharpen his pencils with his fingernails which caused his fingers to swell and ache in great pain.[76]

Mr. Carroll claims the lack of a sufficient legal indigent kit caused him to miss court deadlines and prevented him from filing "important non frivolous pleadings[,]" appeals, complaints, and habeas corpus petitions.[77] He claims not having a sufficient legal indigent kit has "discouraged [him] from attempting to access the courts" because of the "hassle, pain, and frustration" involved in the process.[78] And Mr. Carroll contends the lack of adequate writing supplies has prevented him from communicating with friends, family, and businesses.[79]

Mr. Carroll contends the Geo Group, Delaware County, Delaware County Jail Oversight Board, Jail Oversight Chairman Madden, Facility Administrator David Byrne, Warden Tatum, Classification Coordinate Moore, Counselors Collins and George, Facility Employees Swider and Leach, Compliance Coordinator Bowels, and Warden Laura Williams acted with "deliberate indifference and punitive intent" knowing incarcerated individuals have a constitutional right to a legal indignant kit but failing to provide sufficient kits.[80]

9

II.     **Analysis**

Mr. Carroll *pro se* sues the Geo Group Inc., Geo Corrections, Geo Care, Delaware County, Delaware County Jail Oversight Board, and prison officials and employees including correctional officers, wardens, counselors, supervisors, and law librarians in their official and individual capacities for violating his civil rights.[81] He claim these entities and individuals violated his First, Fourth, Fifth, and Fourteenth Amendment rights because: (1) the conditions of his confinement in the Intake Unit, the Classification Unit, and while in the general population violated his due process rights; (2) the Facility not providing him a legal indigent kit prevented him from accessing the courts; and (3) the Facility denying him access to the law library prevented him from accessing the courts.[82] Mr. Carroll seeks compensatory damages, punitive damages, and nominal damages against each entity and individual sued for their constitutional violations.[83] He also seeks declaratory relief asking us to declare prison conditions are unconstitutional and inmates have a right to an indigent writing kit, and order the Facility provide incarcerated individuals with indigent legal kits.[84]

Mr. Carroll filed two *pro se* civil rights Complaints on May 2, 2022 and May 24, 2022 as a pre-trial detainee at George W. Hill Correctional Facility.[85] We granted Mr. Carroll leave to proceed *in forma pauperis*.[86] We screened his Complaints under 28 U.S.C. § 1915(e)(2)(B) after consolidating the cases.[87] We dismissed with prejudice his claims seeking declaratory relief for past conduct, release from custody, money damages under the Pennsylvania Constitution, all claims asserted against Delaware County Prison and the Facility, and his access to courts claims based on denial of the inmate handbook because efforts to amend would be futile.[88] But we granted Mr. Carroll leave to amend his civil rights and state law claims based on the conditions of

10

confinement at the Intake Unit, access to court in limited instances, as well as derivative official capacity/entity liability/supervisor liability claims.[89]

Mr. Carroll amended his Complaint on March 16, 2023.[90] Congress in 28 U.S.C. § 1915(e)(2)(B)(ii) requires we again screen his amended Complaint and dismiss if he cannot state a claim. We must determine whether Mr. Carroll pleads "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[91] We must dismiss a claim if it "lacks an arguable basis either in law or in fact."[92] The use of the term "frivolous" in section 1915 "embraces not only the inarguable legal conclusion, but also the fanciful factual allegation."[93] "'At this early stage of the litigation,' '[we will] accept the facts alleged in [the *pro se*] complaint as true,' 'draw[] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, . . . contains facts sufficient to state a plausible [] claim.'"[94] Conclusory allegations do not suffice.[95] We construe Mr. Carroll's *pro se* allegations liberally.[96]

Mr. Carroll seeks money damages and other relief for violations of his constitutional rights. Congress allows constitutional claims filed in federal court under 42 U.S.C. § 1983. "To state a claim under [section] 1983, [Mr. Carroll] must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[97] "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.[98]

**A.   We dismiss Mr. Carroll's declaratory relief claim for past conduct with prejudice.**

Mr. Carroll again asks us to declare state actors violated his constitutional rights while holding him in the Intake Unit, Classification Unit, and general population.[99] Mr. Carroll's request for declaratory relief is improper because declaratory relief is not available to adjudicate past

conduct.[100] A declaratory judgment is not "meant simply to proclaim that one party is liable to another."[101] We again dismiss the declaratory relief claim as to past conduct with prejudice.

**B. We dismiss Mr. Carroll's access to court claim with prejudice.**

Mr. Carroll attempts to allege an access to the courts claim based on: (1) Classification Coordinator Moore and Counselors Collins and George not giving him a sufficient legal indigent kit; and (2) Librarian Keith denying him access to the law library.

The right of access to the courts is a fundamental constitutional right.[102] Supreme Court jurisprudence grounds the constitutional basis for the right in the Privileges and Immunities Clause of Article IV, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment's Equal Protection and Due Process Clauses.[103]

In *Bounds v. Smith*, our Supreme Court held the fundamental constitutional right of access to the courts "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."[104] But the Supreme Court twenty years later in *Lewis v. Casey* held *Bounds* did ***not*** establish a freestanding right to a law library or to legal access, but the "(already well-established) right to *access to the courts*."[105] The Court held an inmate must show "actual injury" from the alleged denial of access to the courts.[106] And the actual injury requirements "is not satisfied by just any type of frustrated legal claim," explaining nearly all of the access-to-courts claims in the *Bounds* line of cases involved attempts by inmates to pursue direct appeals from their convictions or habeas petitions.[107] The "tools" required to be provided to inmates to access the courts "are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement."[108] The Court further clarified in *Christopher v. Hanbury* the parameters of the right of access to the courts four years

after *Lewis*: "the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."[109] An incarcerated person must allege both an "anticipated or lost" claim and "the official acts frustrating the litigation."[110]

An incarcerated person claiming a prison official's actions prevented him from presenting a past legal claim must show: (1) he suffered "actual injury," meaning he "lost a chance to pursue a 'nonfrivolous' or 'arguable' underling claim"; and (2) he has no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial of access claim.[111] An incarcerated person must allege the "underlying arguable claim well enough to show that it is 'more than mere hope,' and must describe the 'lost remedy.'"[112] "[T]he underlying cause of action, . . . is an element that must be described in the complaint."[113]

### 1. We dismiss Mr. Carroll's access to courts claim based on the Facility not providing a legal indigent kit.

Mr. Carroll claims Classification Coordinator Moore and Counselors Collins and George failed to provide him with a free legal and writing kit. He claims they only provided him with two plain envelopes, two small pre-sharpened pencils and one or two erasers, but no pencil sharpeners, pens, writing paper, or stamps. Mr. Carroll fails to allege a plausible claim based on Counselors George and Collins not providing him with an adequate legal indigent kit. Based on Mr. Carroll's filings in our court, he has access to paper and appears to have been able to use the pencils to correspond with us and file his legal documents.

Mr. Carroll claims the absence or insufficiency of the legal indigent kit caused him to miss court deadlines and prevented him from filing appeals, nonfrivolous legal claims, and habeas petitions. But he has not plead (after two attempts) the nature of these allegedly lost claims or how he has been harmed. "Such vague and generalized allegations are not sufficient to state a plausible claim."[114]

13

We dismiss Mr. Carroll's access to courts claim based on an inadequate legal indignant kit with prejudice having already given Mr. Carroll an opportunity to amend.

### 2. We dismiss Mr. Carroll's access to courts claim based on access to the law library.

Mr. Carroll claims Librarian Keith denied him access to the law library from November 4, 2021 to December 1, 2021 and from February 1, 2022 to February 27, 2022.[115] He claims he requested access to the law library, but Librarian Keith ultimately declined to put him on the "Law Library List."

Mr. Carroll fails to allege a plausible access to courts claim based on Librarian Keith allegedly barring him from access to the law library. Mr. Carroll concludes not being able to go to the library caused him to miss court deadlines and prevented him from filing appeals, nonfrivolous legal claims, and habeas petitions. But he again does not plead the nature of these allegedly lost claims or how he has been allegedly harmed.

We dismiss this access to courts claim with prejudice after already providing Mr. Carroll with an opportunity to cure these defects.

### C. We dismiss Mr. Carroll's First Amendment retaliation claims with prejudice.

Mr. Carroll claims Librarian Keith and others "frequently retaliated for speech."[116] To state a plausible First Amendment retaliation claim, Mr. Carroll must allege: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.[117] Mr. Carroll's allegations against Librarian Keith are vague and conclusory. Mr. Carroll only claims Librarian Keith "frequently retaliated for speech" but fails to assert what constitutionally protected conduct Mr.

Carroll engaged in, how Librarian Keith retaliated against him, and what adverse action he suffered. And Mr. Carroll does not allege protected conduct substantially motivated the retaliation.

We now dismiss his retaliation claim with prejudice after giving Mr. Carroll an opportunity to cure these defects.

### D. Mr. Carroll does not state a claim based on denial of information about a class action settlement.

Mr. Carroll claims the Geo Group, Delaware County, and others settled a class action lawsuit regarding the conditions of the Intake Unit at the Facility.[118] But Librarian Keith refused to provided Mr. Carroll with information about the settlement.[119] It remains unclear what constitutional right Mr. Carroll alleges Librarian Keith violated by failing to answer Mr. Carroll's inquiry. We liberally interpret his pro se allegation as an access to the courts claim. We assume Mr. Carroll sought the information to bring his own claim about conditions at the Facility's Intake Unit.

But Mr. Carroll repeatedly accesses the courts to challenge the conditions in the Intake Unit. He filed a Complaint, and an amended Complaint, along with multiple motions.[120] He does not allege Delaware County or the Geo Group prevented him from filing other claims because of Librarian Keith's lack of assistance. He cannot establish he suffered an injury caused by an inability to access the courts.[121]

We dismiss this claim with prejudice because we gave Mr. Carroll an opportunity to amend to allege specific facts which he failed to do.

### E. Mr. Carroll states a Fourteenth Amendment conditions of confinement claim for his time in the Intake Unit, but not the Classification Unit or while in the general population.

Mr. Carroll challenges the conditions of his confinement while placed in the Intake Unit, the Classification Unit, and then in Unit 8C of the general population. Mr. Carroll states a plausible

claim based on the conditions while in the Intake Unit, but not while in the Classification Unit or the general population.

The Due Process Clause of the Fourteenth Amendment governs claims brought by pre-trial detainees.[122] A pre-trial detainee must allege his conditions of confinement amount to punishment to plead a Fourteenth Amendment violation.[123] "Unconstitutional punishment typically includes both objective and subjective components."[124] "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind."[125]

"[A] 'particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose.'"[126] We should consider the totality of the circumstances in evaluating such a claim.[127] "In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion," courts are obligated to keep in mind "such considerations are peculiarly within the province and professional expertise of corrections officials."[128] A pre-trial detainee can plead a section 1983 conditions of confinement claim by alleging the combination of conditions amounted to punishment.[129]

### 1. Mr. Carroll may proceed on a limited claim for damages based on his conditions of confinement claim while in the Intake Unit.

Mr. Carroll alleges state actors including, Correctional Officers Weaver and Banks and Warden Tatum, along with unnamed correctional officers supervising the Intake Unit subjected him to extreme over-crowdedness and cold conditions, left the lights on twenty-four hours a day, forced him to sleep on the concrete floor without adequate blankets, and denied him access to the

bathroom, drinking water, and proper clothes while in the Intake Unit from November 4, 2021 until November 13, 2021 and then again from February 1 to February 6, 2022—a total of fourteen days over a three month period.[130]

### i. Mr. Carroll may proceed on his conditions of confinement claim in the Intake Unit based on the overcrowded conditions.

Correctional Officer Banks allegedly placed Mr. Carroll in Intake Unit Cell 3B126 on November 4, 2021 until November 7, 2021 with about seventeen to twenty-five other men.[131] The Facility moved Mr. Carroll to Intake Unit Cell 3B111 on November 7, 2021 until November 13, 2021 with about twenty to twenty-five other men.[132] Mr. Carroll claims he experienced the same overcrowded conditions in Intake Unit Cell 3B111 as Intake Unit Cell 3B126.[133] Mr. Carroll returned to the Facility on February 1, 2022 after the state court judge revoked his bail and the Facility detained Mr. Carroll again from February 1, 2022 to February 6, 2022 in the Intake Unit.[134] Mr. Carroll experienced the same overcrowded conditions in the Intake Unit in February 2022 as those he experienced from November 4 through 13, 2021.[135]

Housing multiple inmates in a cell does not alone establish a constitutional violation.[136] Mr. Carroll must allege the overcrowded conditions amounted to punishment, deprived him of a basic need, or otherwise caused him harm.[137] "[T]he Constitution does not mandate comfortable prisons."[138] We must look to the "totality of the conditions" to determine whether the alleged overcrowded conditions amount to a constitutional violation.[139] Some relevant factors we consider include the length of the confinement, Mr. Carroll's status as either a pre-trial detainee or convicted prisoner, specific individuals involved in creating or failing to remedy the conditions of confinement, and other relevant facts regarding the conditions of confinement.[140]

Mr. Carroll alleges the overcrowded conditions in the Intake Unit caused him harm. He lived with about seventeen to twenty-five men housed in a cell measuring twelve by seven feet.

Mr. Carroll could not take more than one step in any direction which resulted in "severe irritation, emotional distress, anxiety, mental anguish, and feet, neck and back pain."[141] Although he tried to carefully jog in place, parts of Mr. Carroll's leg would go numb every day due to prolonged sitting on the cramped concrete floor.[142] Mr. Carroll remained in the Intake Unit a total of fourteen days over a three month period and he alleges more than just uncomfortable conditions as he pleads specific injuries during this time.

Mr. Carroll's claim of overcrowding satisfied the subjective prong of the "punishment" test, *i.e.*, he claims Classification Coordinator Moore, Lieutenant Moore, and Correctional Officers Weaver and Banks had an express intent to punish him because they knew of the overcrowded conditions, there were more open cells available to accommodate the pre-trial detainees, and they knew about these alternatives but they never made any effort to move the pre-trial detainees into more humane conditions.[143]

We allow Mr. Carroll to proceed on his conditions of confinement claim against Classification Coordinator Moore, Lieutenant Moore, Correctional Officer Weaver, and Banks in their individual capacity for monetary damages given their personal involvement in exposing Mr. Carroll to the overcrowded conditions.

### ii. Mr. Carroll may proceed on his conditions of confinement claim in the Intake Unit based on the extreme cold and lack of adequate clothing.

Mr. Carroll claims temperatures in the Intake Unit reached extremely cold temperatures at night.[144] "Inmates 'have a right to adequate ventilation and a right to be free from extreme hot and cold temperatures[,] . . . '[b]ut the Constitution does not give inmates the right to be free from all discomfort.'"[145] "For cold temperatures to give rise to constitutional violation, [Mr. Carroll] must show that the cold conditions were sufficiently serious in that [he was] denied 'the minimal civilized measure of life's necessities.'"[146]

Judge Pratter recently considered a pre-trial detainee's claim based on the conditions of confinement in *Dicks v. Tillmen* where the pre-trial detainee pled a facility housed him in a cold cell, "with no further elaboration about the actual temperature conditions and the length of time the condition existed."[147] Judge Pratter found these "bare allegations" insufficient to state a plausible claim because "the mere exposure to such conditions with . . . no claim that they caused any significant harm, does not rise to the level of being objectively serious."[148]

We are also guided by Judge Goldberg's analysis in *May v. George W. Hill Correctional Facility*, where a pre-trial detainee claimed the Facility denied him bedding for two-weeks, exposed him to "freezing cold" air temperatures, and forced him to share a cell with a "sickly" person.[149] Although Judge Goldberg acknowledged the conditions "may not be pleasant or desirable," the pre-trial detainee's "allegations accepted as true fail to allege how the complained of conditions were 'sufficiently serious' to pose a substantial risk of serious harm to his health or safety, or that any Defendant knew of and disregarded that risk."[150]

Judge McNulty faced similar facts to us in *Davis v. Yates* where two pre-trial detainees alleged the conditions of their confinement, most notably the lack of heat violated their Fourteenth Amendment rights.[151] Judge McNulty found the pre-trial detainees stated a plausible claim where they alleged their cells were "ice cold" reaching temperatures of fifty and sixty-five degrees, the state actors did not provide additional blankets despite their requests, and they suffered sleep deprivation due to the cold temperatures.[152]

Mr. Carroll barely passes the line to a plausible claim in this second attempt. He has plead the actual temperature of the cell reached low temperatures (forty to fifty degrees during the night), for a specific length of time, (approximately fourteen days), and his actual injury from the cold and lack of adequate clothing (extreme sleep deprivation, physical pain, and depression, anxiety,

and mental anguish). Mr. Carroll pleads the Facility gave him and the other pre-trial detainees only two thin white sheets and one small blanket for sleeping on the concrete floor without any bedding or mattress. And Correctional Officers Weaver and Banks only issued him two shirts, two pairs of pants, and shoes, but no socks, underwear, undershirts, sweatshirts, sweatpants, athletic shorts, thermals, or shower shoes despite the extremely cold temperatures. Unlike in *May*, Mr. Carroll alleges the extreme cold conditions affected his physical and mental health. And he claims Officer Banks and Weaver did not issue him adequate clothing and blankets to accommodate the cold like the correctional officers in *Davis*.

Mr. Carroll's alleged deprivations and exposures reflect more than the denial of a comfortable prison, but rather the denial of the minimal civilized measure of life's necessities like warmth and sufficient sleep in the overcrowded and extremely cold cell Intake Cell.

We allow Mr. Carroll to proceed on his conditions of confinement claim against Correctional Officer Weaver and Banks in their individual capacity for monetary damages given their personal involvement in exposing Mr. Carroll to extremely cold conditions and denying him adequate clothing and blankets.

### iii.  Mr. Carroll's other complained of conditions in the Intake Unit do not amount to a constitutional violation.

Mr. Carroll claims other conditions in and around the Intake Cell violate his Fourteenth Amendment rights including the excessive noise in and around the Intake Cell, the light illuminated for twenty-four hours a day, and correctional officers denying him access to the bathroom and drinking water. Mr. Carroll fails to plead these conditions amount to punishment under the Fourteenth Amendment. We dismiss these claims with prejudice after having already given Mr. Carroll an opportunity to amend.

20

Mr. Carroll's complaints about the excessive noise in and around the Intake Cell causing him headaches and further preventing him from sleeping alone do not amount to a Due Process violation.[153] Although constant and intolerably loud noises over an extended period may amount to a constitutional violation, sporadic loud noises over the course of a few days do not rise to the level of a constitutional violation.[154] We are faced with facts distinct from those Judge Kim encountered in *Millsapp v. Moreci*, where a pre-trial detainee claimed state actors subjected him to an "intolerably loud and relentless roaring sound that lasted over the course of a four-month period."[155] Judge Kim considered the facts alleged to be more than allegations of sporadic loud noises occurring over the course of a few days.[156] Unlike in *Millsapp*, Mr. Carroll's conclusory claims of sporadic, prolonged loud noises do not amount to a constitutional violation.

Mr. Carroll's allegation Delaware County and the Geo Group left the lights on twenty-four hours a day, seven days a week is also not a plausible basis for a claim Mr. Carroll suffered punishment.[157] We agree with several other judges who found continuous lighting in a holding cell is not unreasonable.[158]

Mr. Carroll also claims correctional officers expected him to use the inoperable and unsanitary toilet.[159] And he alleges Correctional Officers Weaver and Banks, "frequently denied [him] . . . use of [the] bathroom." [160] While Mr. Carroll asserts he could not use the bathroom at times, he fails to allege such facilities were not available.[161] Mr. Carroll also does not plead how long the correctional officers denied him access to the bathrooms at any given time, or whether he suffered some other result of being denied access to the bathroom. And "[a]llegations that housing detainees in unsanitary spaces does not alone violate the detainee's due process rights."[162]

Chief Judge Tucker, faced with similar facts in *Johnakin v. Berks County Jail System,* found the pre-trial detainee failed to plead his conditions of confinement claim where he

21

encountered leaking toilets and mold because these "are not the kinds of sufficiently serious prison conditions that give rise to a constitutional claim for a pretrial detainee" especially where "he was only exposed to these conditions for approximately five weeks."[163] Mr. Carroll's time in the Intake Unit lasted fourteen days, and while he asserts he could not use the bathroom at times, he fails to alleged such facilities were not available during this time.[164]

Mr. Carroll also pleads the Intake Cell contained an inoperable water fountain and Correctional Officers Weaver and Banks, "frequently denied [him] water[.]" [165] Depriving Mr. Carroll of drinking water for several days may violate the Constitution when not done for a legitimate penological reason.[166] Our Court of Appeals found depriving water and access to fluids is "sufficiently serious" and may in some circumstances demonstrate "deliberate indifference" to sustain a claim.[167] Our Court of Appeals also observed if the incarcerated person "were to have had access to adequate hydration during the period in question, even in conjunction with meals he otherwise did not desire to eat, his claim would necessarily fail, as he would not be able to show that the complained-of deprivation was 'sufficiently serious.'"[168] Mr. Carroll fails to allege whether he asked for drinking water. He only pleads Correctional Officers Weaver and Banks denied him drinking water, but he does not plead how long the Officers denied him drinking water at any given time, or whether he became dehydrated or suffered some other result of being denied drinking water.

We dismiss Mr. Carroll's conclusory statements about the excessive noise, lights, the conditions of the toilet and water fountain with prejudice because we have already given Mr. Carroll an opportunity to amend these claims.

### 2. Mr. Carroll fails to state a conditions of confinement claim while in the Classification Unit.

Mr. Carroll alleges unknown correctional officers transferred him to the Classification Unit before giving him permanent housing on November 13, 2021 until November 20, 2021 where he shared a cell with one other man.[169] Mr. Carroll and his cellmate remained in the cell twenty-four hours a day for those seven days.[170] Mr. Carroll pleads correctional officers gave him insufficient blankets to keep him warm in the cold cell where temperature fell between thirty to forty-five degrees at night.[171] Mr. Carroll then returned to the Classification Unit on February 6, 2022 until February 27, 2022.[172] Correctional officers again confined Mr. Carroll to his cell for twenty-four hours a day, seven days a week.[173] He claims the denial of time out of his cell for these eighteen days caused him to become depressed, suffer stress and anxiety, and overall had a detrimental effect on his physical and mental health.[174]

A detention official punishes a pre-trial detainee in violation of the Due Process Clause by restricting the detainee and "(1) 'there is a showing of express intent to punish on the part of [those] [ ] officials'; (2) 'the restriction or condition is not rationally related to a legitimate non-punitive government purpose,' *i.e.,* 'if it is arbitrary or purposeless'; or (3) 'the restriction is excessive in light of that purpose.'"[175] "[M]aintaining internal security and order in jails and prisons are 'legitimate governmental objectives'" which may justify placement of a detainee in administrative segregation, and "courts must give prison officials considerable discretion to manage internal security in their institutions."[176] And although "prolonged or indefinite confinement in . . . segregation may implicate due process considerations[,]" "short stays in unpleasant conditions may not amount to punishment."[177]

Judge Rambo considered a similar claim in *McCollum v. Pries* where a pre-trial detainee challenged the conditions of his confinement and alleged the correctional officers "continuously locked down [him and other pre-trial detainees] due to a severe staff shortage" which lasted

"anywhere from 19-23 days a month[.]"[178] Judge Rambo found the pre-trial detainee failed to state claim because he did not show the state actors imposed the lockdowns for the purpose of punishment but were instead a result of a severe staff shortage.[179]

Mr. Carroll alleges the state actors denied all inmates time out of the cell until they were placed in permanent housing – so it does not appear the Facility placed Mr. Carroll alone in administrative segregation.[180] Although Mr. Carroll claims the lockdowns "were not due to any exigent circumstance or legitimate penological reasons based on [his] information and belief" he fails to allege facts showing an express intent to punish.[181] Mr. Carroll offers no facts to show the state actors imposed the lockdowns for the purpose of punishment. The facts alleged instead show an unknown officer told the pre-trial detainees they had to remain in their cells until classified.[182] Mr. Carroll's pled conclusion is too undeveloped to state a plausible claim. Mr. Carroll does not plead a plausible constitutional violation because he has not alleged the "continuous block/unit lockdown" amounted to punishment.

Mr. Carroll also contends the average temperature in the cell fell between thirty to forty-five degrees and frost covered the window.[183] We acknowledge Mr. Carroll felt uncomfortably cold, but he did not go without clothing or bed linens overnight and no longer slept on the cold concrete floor as he did in the Intake Unit. These conditions, and considering the short duration, do not meet the objective punishment prong.

Mr. Carroll's allegations do not suggest the conditions in the Classification Unit either amounted to punishment or deprived him of any basic human need such as food, medical care, sanitation, or security.[184] Mr. Carroll fails to plead the conditions of his confinement in the Classification Unit violated his constitutional rights. We dismiss his Fourteenth Amendment claim with prejudice given Mr. Carroll's has had an opportunity to amend.

24

### 3. We dismiss Mr. Carroll's conditions of confinement claim while in the General Population.

The Facility transferred Mr. Carroll to the general population's Unit 8C Cell 206 on February 28, 2022.[185] The Facility gave Mr. Carroll a "normal size two man bunkbed cell[.]"[186]

Mr. Carroll claims state actors denied him "time out of the cell for six months" while in the general population.[187] Mr. Carroll alleges Correctional Officers Scott, Gilbert, Adaghe, Hilton, and Gallangher, along with unnamed officers continue to keep Mr. Carroll confined to his cell for most of the day.[188] They only allow Mr. Carroll out for about two hours per week to eat, use the bathroom, shower, visit his counsel, and call family or friends.[189] Some weeks the correctional officers only give Mr. Carroll one hour or thirty minutes of time outside his cell.[190]

Judge Padin considered a conditions of confinement claim in *Young v. Avilez*, where a pre-trial detainee alleged he could not leave his cell for up to twenty-four hours to shower and exercise.[191] Judge Padin found the alleged facts did not state a conditions of confinement claim because the pre-trial detainee did not plead facts from which he could infer the pre-trial detainee had been deprived of showers or exercise "to such an extent that there was a significant threat to [his] well-being" because he "[p]resumably . . . was permitted to shower and exercise at all other times."[192] And in *Autery v. Moore*, Judge Schmehl found no constitutional violation where a pre-trial detainee "alleges [ ] at most, he was deprived of a shower and recreation time only a few days at a time."[193] Judge Schmehl reasoned "[t]his does not constitute the type of hardship that amounts to constitutional punishment."[194]

Like in *Young*, where the pre-trial detainee alleged he could not leave his cell for twenty-four hours, Mr. Carroll claims Correctional Officers Scott, Gilbert, Adaghe, Hilton, and Gallangher only allow Mr. Carroll time out of his cell for about two hours per week to eat, use the bathroom, shower, visit his counsel, and call family or friends.[195] And some weeks the correctional

officers only give Mr. Carroll thirty minutes of time outside his cell.[196] Mr. Carroll pleads his mental and physical health has deteriorated and suffers depression, anxiety, mental anguish, and emotional distress.[197]

But Mr. Carroll does not plead details regarding the alleged excessive isolation/lockdown to allege it amounted to a punishment. He does not plead whether he had a cellmate or cellmates during this period of time. He fails to allege whether correctional officers gave him a reason for the lockdown periods. And Mr. Carroll does not specify the time in isolation beyond being allowed out only "two hours per week," but sometimes only "an hour" per week and "some weeks only thirty minutes" while "some weeks we were locked in our cells all week" during the collective six months in detention. Like Judge Schmehl found in *Autery v. Moore*, the facts alleged do not constitute the type of hardship amounting to constitutional punishment."[198]

Mr. Carroll claims other conditions of his confinement in the general population also violate his Fourteenth Amendment right including not having adequate cleaning supplies, not getting access to the gym and weightroom, his outdated bed, and the inoperable water fountain and bathroom. Mr. Carroll fails to plead these conditions amount to punishment under the Fourteenth Amendment.

Mr. Carroll describes his cell as "extremely dirty" upon his arrival littered with dirty towels, papers, plastic, and other forms of trash.[199] And he claims Correctional Officers Gilbert, Scott, Adaghe, Hilton, Gallangher, and other unnamed officers denied him access to cleaning supplies.[200] But unsanitary spaces alone do not violate Mr. Carroll's due process rights.[201]

Mr. Carroll claims correctional officers also denied him access to the gym and weightroom while in the general population. He claims he has been denied "space, equipment, and time to exercise for thirteen months and counting."[202] But "[t]he denial of showers and exercise for short

periods does not constitute the type of serious deprivation that amounts to a constitutional violation."[203] "Lack of exercise may amount to a constitutional violation where it poses a significant threat to an inmate's physical and mental well-being. For example, lack of exercise may constitute cruel and unusual punishment where 'movement is denied and muscles are allowed to atrophy.'"[204] Mr. Carroll does not plead a plausible constitutional violation because he has not alleged him not having access to the gym or weightroom amounted to punishment.

Mr. Carroll also complains about his outdated bed with a section missing causing him neck and back pain. But he does allege facts showing this bed, while uncomfortable amounted to a punishment, or the correctional officers intended to punish him. And although he claims Correctional Officers Scott and Gilbert were aware of Mr. Carroll's defective bed, they remedied his defected bed after about one month.

Mr. Carroll also claims the bathroom in his cell did not flush properly and the water fountain ran water at a very low pressuring making it unusable. This malfunction resulted in his and his cellmate's waste "constantly accumulat[ing]" in the broken toilet and toilet would then overflow.[205] While Mr. Carroll pleads he could not use the bathroom or water fountain in his cell at times, he fails to allege the Facility did not make a bathroom or water fountain available to him. Mr. Carroll instead admits he and his cell mate "[s]ometimes" had to use other inmates' cell bathrooms which he describes this as "a hassle, embarrassing, and very stressful for everyone."[206] This hassle is not a constitutional violation under the plead facts.

Mr. Carroll's allegations regarding time spent out of his cell, access to adequate cleaning supplies, access to the gym and weightroom, his outdated bed, and the inoperable water fountain and bathroom do not suggest the conditions in the general population either amounted to

punishment or deprived him of any basic human need such as food, medical care, sanitation, or security.[207]

### F. Mr. Carroll pleads a municipal liability claim for conditions of confinement in the Intake Unit against Geo Group, Inc., Delaware County, and the Delaware County Jail Oversight Board.

Mr. Carroll sues individual defendants in their official and individual capacities as well as Delaware County, the Geo Group, Inc., Geo Corrections, Geo Care, and the Delaware County Jail Oversight Board. We consider the official capacity claims against the individual defendants along with the claims against Delaware County, the Geo Group, Inc., Geo Corrections, Geo Care, and the Delaware County Jail Oversight Board since claims against county-level officials named in their official capacity are indistinguishable from claims against the County, Geo Group, Geo Corrections, Geo Care, and the Delaware County Jail Oversight Board.[208] "[A]n official-capacity suit is . . . treated as a suit against the entity."[209] We construe the official capacity claims as claims brought against the County, Geo Group, Geo Corrections, Geo Care, and the Delaware County Jail Oversight Board.

Mr. Carroll must allege a policy or custom caused the violation of his constitutional rights as a basis for liability against a municipal entity under section 1983.[210] "To satisfy the pleading standard, [Mr. Carroll] must . . . specify what exactly that custom or policy was."[211] "Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."[212] "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."[213] It is not enough to only allege a policy or a custom exists. Mr. Carroll "must also allege that the policy or custom was the 'proximate cause' of his injuries."[214] Mr. Carroll must establish "knowledge of similar unlawful conduct in the past, fail[ing] to take precautions against future violations, and that

its failure, at least in part, led to [plaintiff's] injury" for a custom to be the proximate cause of an injury.[215] Allegations paraphrasing the standard for municipal liability are too vague and generalized to support a plausible claim.[216] And using the words "custom" and "policy" is not enough.[217]

Mr. Carroll may also state a basis for liability by "alleging failure-to-supervise, train, or discipline ... [and alleging facts showing] that said failure amounts to deliberate indifference to the constitutional rights of those affected."[218] "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."[219]

We are guided by Judge Pappert's reasoned decision in *Camps v. Nutter* where he found pre-trial detainee stated a claim against the City of Philadelphia where he alleged the City owned and operated the prison and "maintained policies that created unconstitutional risks, including a custom of housing inmates in overcrowded cells."[220] Judge Pappert considered how the pre-trial detainee alleged he experienced "pervasive overcrowding [in] the [prison]" and the "[prison] population as a whole has increasingly been subjected to extended periods of restricted movement and lockdowns," suggesting all inmates suffered the same circumstances—a fact which could establish a practice or custom.[221]

Mr. Carroll claims the Geo Group operates and manages the Facility through a "professional services contract" with Delaware County and the Delaware County Oversight Board.[222] Mr. Carroll's alleges the Geo Group, Delaware County, and the Delaware County Jail Oversight Board knew of the extreme overcrowded conditions in the Intake Unit and its inhumane and unsafe conditions yet implemented a policy to place inmates into severely overcrowded and

cold cells. Construing Mr. Carroll's claims liberally, he contends the Geo Group, Delaware County, and/or the Delaware County Jail Oversight Board created and maintained policies which created unconstitutional risks, including a custom of housing inmates in overcrowded cells. And like in *Camps*, where the pre-trial detainee alleged he experienced pervasive overcrowding in the prison, Mr. Carroll alleges all inmates suffered the same overcrowded and cold conditions in the Intake Unit, which could establish a practice or custom.[223] He also claims Jail Oversight Chairmen Kevin Madden, Facility Administrator David Byrne, the Facility's Deputy Warden Coloucci, and Lieutenant Moore, as official policymakers and chief decision makers, knew about and acquiesced in the policy in deliberate indifference of his constitutional rights.

Mr. Carroll has pled a policy exists, he has elaborated on "what exactly that custom or policy was" and he has alleged facts which could establish a practice or custom against Geo Group and/or Delaware County and the Delaware County Jail Oversight Board.[224] But Mr. Carroll makes no specific allegations against Geo Corrections or Geo Care. Without any facts, we are unable to determine what claims Mr. Carroll asserts against them.

We dismiss Mr. Carroll civil rights claims against Geo Corrections and Geo Care with prejudice but allow Mr. Carroll's limited claim regarding the cold and overcrowded conditions in the Intake Unit to proceed against Geo Group, Delaware County, and the Delaware County Jail Oversight Board.

### G. We dismiss Mr. Carroll's claims against certain supervisors.

Mr. Carroll contends Facility Administrator David Byrne, Warden Lee Tatum, Deputy Warden Mario Coloucci, and Lieutenant Moore knew from personal observation about the "inhumane conditions" in the Intake Unit but failed to remedy the problem "with deliberate indifference and punitive intent."[225] Mr. Carroll also claims Correctional Officers Banks and

Weaver's failure to issue appropriate clothing to him in the intake unit resulted from "a custom, policy and/or practice created or maintained" by the Geo Group, the Delaware County Jail Oversight Board, Jail Oversight Chairmen Kevin Madden, Facility Administrator David Byrne, the Facility's Deputy Warden Coloucci, and Lieutenant Moore "including as a result of them failing to properly train and supervise" Correctional Officers Weaver and Banks.[226]

There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates."[227] First, a supervisor may be liable if he or she "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm."[228] "Second, a supervisor may be personally liable under section 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct."[229] Generalized allegations a supervisory state actor is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation.[230]

"A supervisor may be liable for [his or her] failure to train or supervise employees. . . ."[231] A claim for supervisory liability or liability based upon a failure to train involves four elements: (1) an existing policy created an unreasonable risk of constitutional injury; (2) the supervisor knew this unreasonable risk; (3) the supervisor remained indifferent to the risk; and (4) injury resulted from the policy or practice.[232] Where a need for "more or different training . . . is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train . . . can fairly be said to represent official policy," and failure to train "actually causes injury," a supervisor may be held liable. [233]

We allow Mr. Carroll's limited claim about the conditions of confinement in the Intake Unit to proceed against Facility Administrator Byrne, Warden Lee Tatum, Deputy Warden Coloucci, Lieutenant Moore, and Jail Oversight Chairmen Madden in their personal capacities as Mr. Carroll pled at this stage they acted personally and alleges, although with limited facts, specific policies, knowledge, indifference, and injury.

But we dismiss Mr. Carroll's claims against the remaining supervisors and/or prison officials with prejudice including: Sergeant McCaffrey; Sergeants Serody and Royals; Correctional Officers Scott, Gilbert, Adaghe, Hilton, and Gallangher; Compliance Coordinator Bowel; Employees Leach and Swider; Counselors Collins and George; Librarians Keith and Shaw; and Warden Williams. Mr. Carroll fails to plead they were responsible for an alleged constitutional wrong either in their personal capacity or as a supervisor.

## III.   Conclusion

We dismiss with prejudice Mr. Carroll's claims in his amended Complaint seeking declaratory relief for past conduct because efforts to amend would be futile. We also dismiss with prejudice the conditions of confinement claims based on Mr. Carroll's time in the Classification Unit and while in the general population with prejudice. We also dismiss Mr. Carroll's access to courts claims, First Amendment retaliation claim, and claim based on denial of information about a class settlement with prejudice as we have given him an opportunity to amend.

We allow Mr. Carroll to proceed on his conditions of confinement claim based on the extreme cold and overcrowded conditions of the Intake Unit. We allow Mr. Carroll's limited claim about the conditions of confinement in the Intake Unit to proceed against Correctional Officers Banks and Weaver, Classification Coordinator Moore, Facility Administrator Byrne, Warden Lee

32

Tatum, Deputy Warden Coloucci, Lieutenant Moore, Jail Oversight Chairman Madden, Geo Group, Delaware County, and the Delaware County Jail Oversight Board.

---

[1] ECF Doc. No. 46 at 7. Mr. Carroll mailed his amended Complaint from the Facility a month ago. *Id.* at 31 of 32 (using the CM/ECF pagination).

[2] *Id.* ¶ 6.

[3] *Id.* ¶¶ 7–8.

[4] *Id.* ¶ 9.

[5] *Id.* ¶¶ 10–11.

[6] *Id.* ¶¶ 12, 15.

[7] *Id.* ¶¶ 13–14.

[8] *Id.* ¶ 30.

[9] *Id.* ¶ 31.

[10] *Id.* ¶ 32.

[11] *Id.* ¶ 33.

[12] *Id.* ¶ 31.

[13] *Id.* ¶ 40.

[14] *Id.* ¶ 31.

[15] *Id.* ¶¶ 31, 36, 39.

[16] *Id.* ¶¶ 38, 48.

[17] *Id.* ¶ 37.

[18] *Id.* ¶¶ 34–35.

[19] *Id.* ¶ 32.

[20] *Id.* ¶ 45.

[21] *Id.* ¶ 46.

[22] *Id.* ¶ 47.

[23] *Id.* ¶ 41.

[24] *Id.* ¶ 42.

[25] *Id.*

[26] *Id.* ¶ 43.

[27] *Id.*

[28] *Id.* ¶¶ 55, 60.

[29] *Id.* ¶ 55.

[30] *Id.* ¶ 57.

[31] *Id.* ¶¶ 57, 64.

[32] *Id.* ¶ 60.

[33] *Id.* ¶¶ 60–61.

[34] *Id.* ¶ 59.

[35] *Id.* ¶¶ 44, 48.

[36] *Id.* ¶ 44.

[37] *Id.* ¶ 44.

[38] *Id.* ¶¶ 44, 51.

[39] *Id.* ¶¶ 48, 51.

[40] *Id.* ¶ 52.

[41] *Id.* ¶ 64.

[42] *Id.*

[43] *Id.*

[44] *Id.* ¶ 65.

[45] *Id.* ¶¶ 90, 95.

[46] *Id.* ¶ 91.

[47] *Id.* ¶ 97.

[73] *Id.*

[74] *Id.* ¶ 83.

[75] *Id.* ¶ 84.

[76] *Id.* ¶ 85.

[77] *Id.* ¶ 86.

[78] *Id.*

[79] *Id.* ¶ 87.

[80] *Id.* ¶ 84.

[81] *Id.* at 2–5.

[82] *Id.* Mr. Carroll alleges no facts in support of his Fourth Amendment claim. The Fourth Amendment's privacy protections for individuals are incorporated through the Fourteenth Amendment; these protections guard against unconstitutional searches and seizures by state officials. See *Parkell v. Danberg*, 833 F.3d 313, 324 n.6 (3d Cir. 2016). But our Court of Appeals has held an individual's Fourth Amendment right "to be free from unreasonable searches[ ] is fundamentally inconsistent with incarceration." *Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001). An incarcerated individual has "a limited right of bodily privacy, subject to reasonable intrusions necessitated by the prison setting." *Parkell*, 833 F.3d at 325. We dismiss Mr. Carroll's unpled Fourth Amendment claim with prejudice after already providing him with an opportunity to amend.

[83] ECF Doc. No. 46 at 24–27.

[84] *Id.*

[85] In No. 22-1720, Mr. Carroll sued the Facility; Delaware County; the Geo Group, Inc.; unknown facility administrators, managers, staff members, wardens, deputy wardens, intake supervisors and correctional officers; Correctional Officers Weaver and Banks; Brick Tripp (Mr. Carroll asserts Mr. Tripp is the "assistant warden" and was the "acting warden" for a period of time); Warden Laura Williams; Law Librarian Dana Keith; and Kevin Madden, a Delaware County Councilman and Chairman of the County's Jail Oversight Board (*see* https://www.delcopa.gov/council/deptliaisons.html (last viewed April 6, 2023); https://www.delcopa.gov/prison/job.html (last viewed April 6, 2023). Each are named in their official and individual capacities.

In his second case, No. 22-2110, Mr. Carroll sues Delaware County Prison; the Facility; Delaware County; Jane Does #1 and #2; the Geo Group, Inc.; Brick Tripp; Laura Williams; Kevin Madden; Aiyanah Collins; Shawnell George; John Swider; Oscar Lemus; Richard Leach; and Susan Sendall. Each are named in their official and individual capacities. In both cases, Mr. Carroll cites numerous federal constitutional provisions.

[86] ECF Doc. No. 13.

[87] ECF Doc. Nos. 38, 39.

[88] ECF Doc. No. 38.

[89] *Id.*

[90] ECF Doc. No. 46.

[91] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).

[92] *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

[93] *Id.*

[94] *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015)).

[95] *Iqbal*, 556 U.S. at 678.

[96] *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).

[97] *West v. Atkins*, 487 U.S. 42, 48 (1988).

[98] *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)); *see also Iqbal*, 556 U.S. at 676 (explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution").

[99] ECF Doc. No. 46 at 27.

[100] *See Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another."); *see also Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (*per curiam*) ("Declaratory judgments are meant to define the legal rights and obligations of the parties in the anticipation of some future conduct.").

[101] *Corliss*, 200 F. App'x at 84 (*per curiam*); *see also Taggart v. Saltz*, No. 20-3574, 2021 WL 1191628, at *2 (3d Cir. Mar. 30, 2021) (*per curiam*) ("A declaratory judgment is available to define the legal rights of the parties, not to adjudicate past conduct where there is no threat of continuing harm.").

[102] *Lewis v. Casey*, 518 U.S. 343, 350 (1996).

[103] *Id.*; *Christopher v. Harbury*, 536 U.S. 403, 415, n. 12 (2002) (collecting cases).

[104] 430 U.S. 817, 828 (1977) (footnote omitted).

[105] *Lewis*, 518 U.S. at 350 (emphasis in original).

[106] *Id.* at 351–52.

[107] *Id.* at 354.

[108] *Id.* at 355.

[109] *Christopher*, 536 U.S. at 414–15.

[110] *Id.* at 415.

[111] *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008), 536 F.3d at 205 (quoting *Christopher*, 536 U.S. at 415).

[112] *Id.* at 205–06 (quoting *Christopher*, 536 U.S. at 416–17) (footnote omitted).

[113] *Short v. Byrne*, No. 19-3020, 2019 WL 3841800, at *4 (E.D. Pa. Aug. 14, 2019) (quoting *Christopher*, 536 U.S. at 415)

[114] *Hernandez v. Delaware Cnty. of Pennsylvania*, No. 22-4187, 2023 WL 349254, at *6 (E.D. Pa. Jan. 20, 2023) (citing Prater v. City of Philadelphia, 542 F. App'x 135, 137 (3d Cir. 2013)).

[115] ECF Doc. No. 46 ¶¶ 90, 95.

[116] *Id.* ¶ 96.

[117] *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *see also Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Coit v. Garman*, 812 F. App'x 83, 86 (3d Cir. 2020) (*per curiam*).

[118] ECF Doc. No. 46 ¶ 97.

[119] *Id.* ¶ 97.

[120] *See* ECF Doc. Nos. 1, 2, 8, 9, 16, 17, 21, 23, 28, 40, 42, 22, 26.

[121] *See Jackson v. Whalen*, 568 F. App'x 85, 87 (3d Cir. 2014) (*per curiam*) (holding a "prisoner making an access-to-the-courts claim is required to show that the denial of access caused actual injury" (quoting *Lewis*, 518 U.S. at 350); *Christopher*, 536 U.S. at 415 (2002).

[122] *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).

[123] *Bell v. Wolfish*, 441 U.S. 520, 538 (1979).

[124] *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007).

[125] *Id.* (internal quotations and alterations omitted).

---

[126] *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson*, 495 F.3d at 68), *abrogated on other grounds*; *see also Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017).

[127] *Bistrian*, 696 F.3d at 373 ("In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution.").

[128] *Stevenson*, 495 F.3d at 68 n.3.

[129] *See, e.g., Bistrian*, 696 F.3d at 373; *Conway v. Cty. of Camden*, No. 16-9550, 2017 WL 3783263, at *2–3 (D.N.J. Aug. 31, 2017) (finding prisoner sufficiently pled a plausible basis for a claim he experienced unconstitutionally punitive conditions as a detainee where he alleged, among other things: prison officials housed him in a two-person cell with three other people and required him to sleep on the floor next to the toilet with only a thin mattress; the facility had only one set of fingernail clippers for all inmates on the unit and he sustained a skin infection; mold at the facility caused him respiratory problems; a lack of hot water in the cells; he sustained insect bites; and the facility housed him with inmates infected with MRSA).

[130] ECF Doc. No. 46 ¶¶ 30–52.

[131] *Id.* ¶ 30.

[132] *Id.* ¶ 41.

[133] *Id.* ¶ 42.

[134] *Id.* ¶ 44.

[135] *Id.* ¶¶ 44, 51.

[136] *Paulson v. GEO Grp., Inc.,* No. 19-6013, 2020 WL 60143, at *2 (E.D. Pa. Jan. 3, 2020).

[137] *Rivers v. Reilly*, No. 20-0076, 2020 WL 1330746, at *4 (E.D. Pa. Mar. 20, 2020) (citing *Wilson v. Seiter*, 501 U.S. 294, 305 (1991)).

[138] *Clayton v. Bedford Cnty. Sheriff's Dep't.*, No. 16-30, 2019 WL 4016209, at *3 (E.D. Tenn. Aug. 26, 2019) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

[139] *Hubbard v. Taylor*, 538 F.3d 229, 238 (3d Cir. 2008).

[140] *Sherwin v. Camden City*, No. 16-8665, 2018 WL 2383151, at *2 (D.N.J. May 25, 2018).

[141] ECF Doc. No. 46 ¶ 32.

[142] *Id.* ¶ 33.

[143] *Id.* ¶ 45.

[144] *Id.* ¶¶ 44, 51.

[145] *Davis v. Yates*, No. 156943, 2016 WL 5508809, at *7 (D.N.J. Sept. 27, 2016) (internal quotations omitted).

[146] *Regalado v. City of Edinburg*, No. 22-228, 2023 WL 2394299, at *10 (S.D. Tex. Feb. 1, 2023), *report and recommendation adopted*, No. 22-228, 2023 WL 2391014 (S.D. Tex. Mar. 7, 2023) (finding incarcerated individual's "conclusory allegation that he 'was kept in a cold cell with no blankets' is not enough to state a claim.").

[147] *Dicks v. Tillmen*, No. 19-3168, 2020 WL 186440, at *3 (E.D. Pa. Jan. 10, 2020).

[148] *Id.*

[149] *May v. George W. Hill Corr. Facility*, No. 22-5007, 2023 WL 2574979, at *3 (E.D. Pa. Mar. 20, 2023).

[150] *Id.*

[151] *Davis*, 2016 WL 5508809, at *5.

[152] *Id.* at *7.

[153] ECF Doc. No. 46 ¶¶ 34–35.

[154] *Millsapp v. Moreci*, No. 10-6048, 2011 WL 4361555, at *2 (N.D. Ill. Sept. 19, 2011).

[155] *Id.*

[156] *Id.*

[157] ECF Doc. No. 46 ¶ 31.

[158] *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) (continuous lighting in holding cell not unreasonable given security concern and since the inmate had attempted suicide); *Fillmore v. Ordonez*, 829 F. Supp. 1544, 1568 (D. Kan. 1993), *aff'd*, 17 F.3d 1436 (10th Cir. 1994) (around the clock electronic surveillance and lighting reasonably related to prison security did not amount to unconstitutional punishment); *see also King v. Frank*, 371 F. Supp. 2d 977, 984-85 (W.D. Wis. 2005) (constant exposure to fluorescent light which allows prison officials to observe inmates at night did not violate Eighth Amendment standards); *Willis v. Terhune*, 404 F. Supp. 2d 1226, 1230–31 (E.D. Cal. 2005) (exposure to twenty-four hour security lighting did not constitute cruel and unusual punishment in absence of evidence of grave sleeping problems or other harm); *Chavarria v. Stacks*, 102 F. App'x 433, 436-37 (5th Cir. July 20, 2004) (constant illumination in cell did not amount to constitutional violation, where the facility kept the lights on as a reasonable security measure).

[159] ECF Doc. No. 46 ¶ 40.

[160] *Id.* ¶ 43.

[161] *Paulson*, 2020 WL 60143, at *2.

[162] *Sanchez v. Pirolli*, No. 21-4797, 2022 WL 2116830, at *8 (E.D. Pa. June 13, 2022).

[163] *Johnakin v. Berks Cnty. Jail Sys.*, No. 19-3989, 2019 WL 4722214, at *3 (E.D. Pa. Sept. 25, 2019).

[164] *Paulson*, 2020 WL 60143, at *2.

[165] ECF Doc. No. 46 ¶ 43.

[166] *See Young v. Quinlan*, 960 F.2d 351, 364–65 (3d Cir. 1992) (summary judgment not appropriate where factual allegations indicated prison officials placed the inmate in a dry cell for ninety-six hours, without providing drinking water and taunted the inmate about cell conditions), *superseded by statute on other grounds as stated in Nyhuis v. Reno*, 204 F.3d 65, 71 n. 7 (3d Cir. 2000).

[167] *Collier v. Martinez*, 474 F. App'x 870, 874 (3d Cir. 2012) (*per curium*).

[168] *Id.* at n. 5.

[169] ECF Doc. No. 46 ¶ 55.

[170] *Id.* ¶¶ 57, 64.

[171] *Id.* ¶ 59.

[172] *Id.* ¶ 64.

[173] *Id.*

[174] *Id.*

[175] *Mason v. Philadelphia Dep't of Prisons*, No. 22-3312, 2023 WL 1806813, at *9 (E.D. Pa. Feb. 7, 2023) (quoting *Steele v*, 855 F.3d at 504).

[176] *Id.* (quoting *Steele v*, 855 F.3d at 504).

[177] *Friedmann v. Parker*, 573 F. Supp. 3d 1221, 1228 (M.D. Tenn. 2021) (internal citations omitted).

[178] *McCollum v. Pries*, No. 22-01710, 2022 WL 17669003, at *1 (M.D. Pa. Dec. 14, 2022).

[179] *Id.* at *6.

[180] ECF Doc. No. 46 ¶¶ 64–65.

[181] *Id.* ¶¶ 64–65.

[182] *Id.* ¶¶ 64–65.

[183] *Id.* ¶ 57.

[184] *Johnakin,* 2019 WL 4722214, at *3 (citing *Wilson*, 501 U.S. at 305 ("Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.")).

[185] ECF Doc. No. 46 ¶¶ 66–67.

[186] *Id.* ¶¶ 66–67.

[187] *Id.* ¶ 79.

[188] *Id.* ¶¶ 76–77.

[189] *Id.* ¶ 77.

[190] *Id.* ¶ 78.

[191] *Young v. Avilez*, No. 225943, 2023 WL 239988, at *2 (D.N.J. Jan. 18, 2023).

[192] *Id.*

[193] *Autery v. Moore*, No. 22-4015, 2023 WL 2390670, at *6 (E.D. Pa. Mar. 7, 2023).

[194] *Id.*

[195] ECF Doc. No. 46 ¶ 77.

[196] *Id.* ¶ 78.

[197] *Id.* at 24.

[198] *Autery*, 2023 WL 2390670, at *6.

[199] ECF Doc. No. 46 ¶ 66.

[200] *Id.* ¶ 74.

[201] *Sanchez*, 2022 WL 2116830, at *8.

[202] ECF Doc. No. 46 ¶ 79.

[203] *Kreis v. Northampton Cnty. Prison*, No. 21-2360, 2022 WL 4236692, at *7 (E.D. Pa. Sept. 14, 2022) (citing *Fortune v. Hamberger*, 379 F. App'x 116, 122 (3d Cir. 2010) ("Fortune complained of his inability to adequately shower and exercise for a period of fifteen days. Although it is not clear how many times Fortune believes that he should have been permitted to engage in those activities in addition to the time he was already given to do so, he does not allege that he suffered any harm as a result of the denial of additional showers and exercise.").

[204] *Young*, 2023 WL 239988 (quoting *Platt v. Brockenborough*, 476 F. Supp. 2d 467, 471–72 (E.D. Pa. 2007)).

[205] ECF Doc. No. 46 ¶¶ 72–73.

[206] *Id*. ¶ 73.

[207] *Johnakin*, 2019 WL 4722214, at *3 (citing *Wilson*, 501 U.S. at 305).

[208] *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978)).

[209] *Id.* A claim against the Geo Group Inc., a private corporation formerly under contract to provide services at George W. Hill Correctional Facility, must also be based on the entity's policies or customs which caused the alleged constitutional violation. *French v. GEO Grp., Inc.*, No. 18-4312, 2018 WL 4929859, at *2 (E.D. Pa. Oct. 10, 2018) ("The GEO Group acts under color of state law by providing services for the George W. Hill Correctional Facility."); *Regan v. Upper Darby Twp.*, No. 06-1686, 2009 WL 650384, at *3, n.5 (E.D. Pa. Mar. 11, 2009) ("For purposes of Plaintiff's § 1983 claims, Defendant GEO Group, a private company, was acting under the color of state law since it provided daily functional services for the Delaware County Prison."). Jail oversight boards including the Delaware County Jail Oversight Board, are "political subdivision[s] of the government" because they are "creature[s] of statute[.]" *Id.* at *6 (quoting *Veatch v. Allegheny Cnty. Bureau of Corr.*, 282 F. App'x 159, 160 (3d Cir. 2008)). To state a claim against the Board, Mr. Carroll must allege a municipal policy or custom that caused his injury. *Id.*

[210] *See Monell*, 436 U.S. at 694.

[211] *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009).

[212] *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)).

[213] *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

[214] *Williams v. GEO Grp., Inc.*, No. 22-0365, 2022 WL 815446, at *3 (E.D. Pa. Mar. 17, 2022).

[215] *Id.* (internal quotations and alterations omitted).

[216] *See, e.g.*, *Szerensci v. Shimshock*, No. 20-1296, 2021 WL 4480172, at *7 (W.D. Pa. Sept. 30, 2021) ("Plaintiffs' conclusory allegation, which generally paraphrases the relevant standard, is insufficient to state a claim for § 1983 liability under *Monell*.") (citing cases).

[217] *Williams*, 2022 WL 815446, at *4.

[218] *Forrest v. Parry*, No. 16-4351, 2019 WL 2998601, at *8 (3d Cir. July 10, 2019).

[219] *Id.*

43

[220] *Camps v. Nutter*, No. 14-01498, 2017 WL 2779180, at *5 (E.D. Pa. June 27, 2017).

[221] *Id.*

[222] ECF Doc. No. 46 ¶¶ 23–24.
[223] *Camps*, 2017 WL 2779180, at *5.

[224] *Williams*, 2022 WL 815446, at *4 (citing *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) (affirming dismissal of claims against a municipality because the plaintiff alleged only "the City's policy of ignoring First Amendment right[s]" injured him)).

[225] ECF Doc. No. 46 ¶ 46.

[226] *Id.* ¶ 52.

[227] *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).

[228] *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)).

[229] *Id.*

[230] *Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)).

[231] *Whitfield v. City of Philadelphia*, 587 F. Supp. 2d 657, 666 (E.D. Pa. 2008).

[232] *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).

[233] *City of Canton v. Ohio*, 489 U.S. 378, 390 (1989).